George SEAR et al., Plaintiffs,

v.

CADILLAC AUTOMOBILE COMPANY
OF BOSTON et al., Defendants.

Civ. A. No. 78–3088–G.

United States District Court,
D. Massachusetts.

Nov. 19, 1980.

Patricia Randall, Homans, Hamilton &
Lamson, Gail Pennington, Boston, Mass.,
for plaintiffs.

Herbert H. Bennett, Lawrence C. Wing-
er, Portland, Me., for Cadillac.

Philip T. Tierney, Dimento & Sullivan,
Boston, Mass., for Metropolitan Auto Sales-
men.

MEMORANDUM AND ORDERS
DISMISSING COMPLAINT

GARRITY, District Judge.

This is a suit under § 301 of the Labor
Management Relations Act (LMRA), 29
U.S.C. § 185 (1976), brought by plaintiff
salesmen against their employer, defendant
Cadillac Automobile Company of Boston
("the Company") for breach of contract and
against their union, defendant Metropolitan
Automobile Salesmen, Local 122 ("the Un-
ion") for breach of its duty of fair represen-
tation ("DFR"). Cross–motions for summa-
ry judgment were filed by the plaintiff
salesmen and the defendant Company. We
heard oral argument on the Company's mo-
tion for summary judgment on August 22,
1980. Later, on September 2, 1980, we is-
sued a procedural order instructing the
plaintiffs to file their cross–motion by Sep-
tember 18, and instructing both parties to
address specific points of law raised in the
August 22 hearing. Once those briefs were

filed we issued a second procedural order instructing the parties to address the effect of the finality clause on plaintiffs' § 301 suit.

The principal question we address on these cross–motions is whether a provision for final and binding arbitration in a collective bargaining agreement bars an employee's suit against his employer for breach of contract under § 301, where the employer's alleged breach was the subject of arbitration untainted by misconduct of any party, and the only alleged breach of the Union's DFR is its bad faith failure to appeal the award. For reasons more fully explained below, we find the finality clause of this contract bars the employees' suit against the Company because the Union's alleged breach of its DFR–a bad faith failure to appeal the arbitrator's untainted award–does not "seriously undermine the integrity of the abritral process." *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 567, 96 S.Ct. 1048, 1057, 47 L.Ed.2d 231 (1976); *see Anderson v. Grocers Supply Co.*, S.D.Tex., 1979, 483 F.Supp. 73, 77. As a corollary, we hold that as a matter of law, the Union's failure to appeal from a fairly conducted arbitration hearing is not a breach of its duty of fair representation. Hence, it is ordered that plaintiffs' claims against the Company and the Union [1] be dismissed.

## Background

The facts leading up to and surrounding the arbitrator's award are generally undisputed by the parties. The troubles for the Company and the Union began back in March of 1977, when the Company announced plans to implement new sales procedures to improve performance and earnings. The announcement required the salesmen to attend daily training sessions. The salesmen, annoyed that this action was taken without their consultation, responded by letter stating that "Predicated on our experience with sales training schools in the recent past, we do not want to attend the sales classes . . . ." The Company replied by invoking the management rights clause of the collective bargaining agreement, stating that "this training is both beneficial to you as well as the Company . . ." and that it "expects all salesmen to attend. Failure to do so will result in disciplinary action." The Company also told the Union stewards that any disagreement should be resolved through the grievance and arbitration process. After some informal negotiation and agreement between the parties, the salesmen attended the sessions held during the week of March 14. At the request of the business agent of the Union, however, a meeting was held on April 11 between Union and Company officials to discuss the new sales procedures. No agreement was reached, though the Company expressed its willingness to accept specific suggestions from the salesmen to improve the new selling system, short of abandoning it.

The Union steward called a meeting of the salesmen at about 8:00 p. m., that same evening. According to the arbitrator's report, the steward told the salesmen that the Company suggested using the grievance procedure and arbitration. The salesmen responded that they had waited six months to go to arbitration on another matter, and that they didn't want to wait that long— they felt they would all be fired in the interim.

The next morning, Tuesday, April 12, 1977, the salesmen picketed all the entrances to Boston Cadillac from 7:00 a. m. to 8:00 p. m., closing time. Approximately three hours after the stoppage began, the Company received the first formal, written grievance or request for arbitration. This was a mailgram from the Union's business agent, dated April 11 at 10:54 p. m., stating that:

After meeting with you for many hours today it was agreed that neither side could agree on the discussions regarding the sales method and other things. Therefore, this message will serve as a

---

1. We treat the Union's Eighth Defense in its answer, filed January 23, 1979, as its motion to dismiss and/or for summary judgment.

notice that we are going to trial for arbitration unless you can agree that this will be included in the arbitration that is pending.

Management did not respond to this communication.

The salesmen picketing the Company harassed Cadillac customers, kept other Company employees from working, and deliveries were not made. The Company responded to the strike by hand delivering letters to the picketing salesmen, on Tuesday, April 12, which stated:

> This is to officially advise you that you are participating in an illegal work stoppage in violation of Article XV of the current labor agreement.
>
> Unless you return to work on or before 9:00 a. m. on Wednesday, April 12, [sic] your employment with the Cadillac Automobile Company of Boston is terminated.
>
> R. S. Hellawell
>
> General Manager

However, the salesmen did not return to work after receiving these letters, and continued to picket on Wednesday, April 13.

The Company came to this court on Wednesday afternoon to obtain a temporary restraining order against the picketing and stoppage. Judge Skinner issued the order at 3:12 p. m. that day, *Cadillac Automobile Co. of Boston v. Metropolitan Automobile Salesmen, Union No. 122*, D.Mass., 1977, C.A. No. 77–1057–S. Each striking salesman was personally notified of this order, but they all continued to picket until closing time, 9:00 p. m. The salesmen resumed picketing the next morning, Thursday, April 14, 1977, until they disbanded at about 10 to 10:30 a. m. When the salesmen attempted to return to work on Friday morning, April 15, the Company informed them that, as stated in the letter of April 12, their employment had been terminated on Wednesday morning, April 13.

The following Wednesday, April 20, both the Company and the Union appeared before Judge Skinner in connection with the temporary restraining order and the Company's complaint. At this hearing, with the approval of the court, the Union and the Company agreed to arbitrate the issues relating to the strike. However, the court reserved to itself determination of the question of damages, if any, suffered by the Company if the arbitrator found the strike to have breached the contract. The Company further agreed to permit the discharged salesmen to return to work the next day, Thursday, April 21, pending arbitration. The case was then continued.

Arbitration hearings were held before Professor Charles Myers, of M.I.T.'s Sloan School of Management, on September 29 and 30, 1977. The Union was represented by counsel, Union officials, and five of the fifteen plaintiff salesmen. Counsel for the Union filed a brief with the arbitrator after the hearing. Though the exact wording of the issues to be determined by the arbitrator was not settled at the April 20 hearing before Judge Skinner, the parties agreed that the arbitrator could draft the issues after the arbitration hearing. The arbitrator conferred with the Union and the Company about his proposed statement of issues, and subsequently issued a written opinion and award on November 10, 1977. He ruled, *inter alia,* that the salesmen's work stoppage and picketing was a strike in violation of Articles XV and VII of the collective bargaining agreement. Addressing the issue of whether "the management notices of April 12, 1977, to return to work by 9:00 a. m., April 13, or be terminated, [were] proper under the Agreement?" the arbitrator ruled that Articles VI, VII, XIV and XV of the Agreement gave him the authority to evaluate employer discipline " 'up to and including discharge' in the light of the circumstances of the case." Hence, he found that (1) the discharge of the employees was "too severe a penalty," (2) the loss of pay for work days missed between April 12 and April 21 was an "insufficient penalty," and (3) that "each of the salesman is to be restored to employment under the Agreement, with no interruption of accumulated seniority and benefits (except for the period on strike and up to April 21), shall lose the equivalent of five times the amount of pay they lost during the strike,

or 17 days (rounded off), to be determined for each individual by the company on the basis of payroll data . . . ."[2]

A dispute then arose between the Company and the Union over the computation of the fines, resulting in the issuance of a clarifying letter of arbitrator Myers dated December 8, 1977. Though that letter did not end this dispute, fines totalling approximately $20,000 were deducted from the paychecks of the salesmen who were still employed by the Company, and demands for payment of fines totalling approximately $2,500 were made of former employees. The Company, meanwhile, unhappy with the arbitrator's reinstatement of the temporarily discharged salesmen, appealed the arbitration award by filing a new action in this court, C.A. No. 77–3734–S. The complaint was never served on the Union, though, and the Company withdrew the appeal sometime in February of 1978. The Union had refused to meet with the Company concerning the fines assessed during the pendency of this appeal. The Union, however, did not appeal the award.

The Company and the Union reappeared before Judge Skinner on April 28, 1978 in C.A. No. 77–1057–S for a hearing on the assessment of damages to the Company. He adopted the finding of the arbitrator that the strike was illegal, determined the damages to the Company to be $24,778.40, and awarded costs of $2,500. At this hearing, the Union did not raise the issue of the validity of the fines assessed against the individual salesmen. Rather, the Union argued that the fines should be set off against the compensatory damages. Judge Skinner ruled against this argument. Both the Union and the Company appealed to the First Circuit Court of Appeals in May and June of 1978.

The salesmen sought by motion filed in the Court of Appeals to intervene in the appeal to raise the claims that are the subject of the present suit under § 301. Essentially, the salesmen wished to have the fines that had been assessed against them declared to be invalid as unauthorized by the collective bargaining agreement, and that the Union's failure to appeal arbitrator Myer's award was a breach of its DFR since the alleged motivation for the failure to appeal was the Union's desire to have the individual fines set off against the compensatory damages. The First Circuit rejected the salesmen's motion to intervene in an order entered October 10, 1978, *Cadillac Automobile Company of Boston v. Local No. 122, Metropolitan Automobile Salesmen*, 1 Cir., October 10, 1978, No. 78–1270. First, the "applicants' claims raise questions of fact which should not be resolved initially in this court." And further, "[t]here are other forums, administrative and judicial, in which applicants can seek relief." The Court of Appeals went on to reject the Union's argument that the fines should be set off against the compensatory damages, stating that:

> The withholdings from the employees, ordered by the arbitrator without appeal, were specifically distinguished from damages and imposed as a lesser penalty than termination. That is, the arbitrator denied the company its preferred remedy, discharge, and, while restoring the jobs, required payment to be made to the company. To the Union's claim of "windfall" we reply that *this* money was not to compensate for work stoppage loss; it was, by the arbitrator's ruling, the deterrent or punitive equivalent of discharge. The penalties were to be imposed, even if the court were to hold that no damages had been sustained.

*Cadillac Automobile Company of Boston v. Local No. 122, Metropolitan Automobile Salesmen*, 1 Cir., 1978, 588 F.2d 315, 316.

■ At about the time of the April 28, 1978 hearing before Judge Skinner, and before May 1, 1978, the Company went completely out of business. The salesmen pursued their claims against the Union and the

---

**2.** Plaintiffs contend that this part of the arbitrator's award is ambiguous, since, contrary to the arbitrator's statement, the strike lasted only a little over two days rather than a little over three days. Hence, five times pay lost during the strike should compute to 12 days' pay rather than 17. This dispute is most appropriately resolved by the arbitrator.

Company by filing an unfair labor practice charge under section 8(b)(1)(A) of the National Labor Relations Act (NLRA). In a written opinion issued November 7, 1978, the Acting Regional Director of the NLRB "determined that further proceedings on the charge are not warranted."[3] The Director concluded that

> [T]he Union did not breach its duty of fair representation by failing to take a timely appeal of the arbitrator's award. The Union could reasonably have interpreted the award as merely a disciplinary action by the arbitrator in lieu of discharging the salesmen and, therefore, not as a levy against individual members in an attempt to make them liable for damages for a Union–authorized breach of contract. Accordingly, absent a clearly blatant and palpably incorrect decision by the arbitrator in this case, the Union's judgment in not appealing the award was not considered so unreasonable and arbitrary as to amount to a breach of the duty of fair representation.

Undaunted, the salesmen filed this action in federal court under § 301 on November 27, 1978. As we have noted, the salesmen's complaint alleges that the Company's deduction of the fines assessed by the arbitrator breached the collective bargaining agreement, in that the agreement allegedly did not authorize the imposition of fines as a form of employer discipline, and that but for the Union's alleged breach of DFR by failing to timely appeal the arbitrator's award, the fines would have been declared invalid.

### Analysis

■ We begin by noting that there is no dispute that the arbitration hearing held before Professor Myers was fairly conduct-ed. Moreover, the collective bargaining agreement provides in Article VII(3) that:

> the decision of the arbitrator shall be final and binding and shall conclusively determine the subject of the arbitration for the duration of the Agreement. The arbitrator shall render his award within thirty (30) days after the close of the hearing, and the parties agree to comply with any decision rendered under the terms of this agreement. The arbitrator shall not have the power to add to, or subtract from, or modify any of the terms of the Agreement or agreements supplemental hereto.

This "finality clause" is an express contractual recognition of federal labor policy to encourage the settlement of labor–management disputes by arbitration. In fact, Congress has legislated that "[f]inal adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes . . . ." 29 U.S.C. § 173(d) (1976). Even in the absence of an express finality clause in a contract providing for arbitration, finality is generally accorded to an arbitrator's decision because this congressional policy "can be effectuated only if the means chosen by the parties for settlement of their differences under a collective bargaining agreement is given full play." *Steelworkers v. American Mfg. Co.,* 1960, 363 U.S. 564, 566, 180 S.Ct. 1343, 1345, 4 L.Ed.2d 1403; *see Hines v. Anchor Motor Freight,* 1976, 424 U.S. 554, 562, 96 S.Ct. 1048, 1055, 47 L.Ed.2d 231; *Johns–Manville Sales v. Local 1609, Internat'l Ass'n of Mach.,* 5 Cir., 1980, 621 F.2d 756, 758.

■ Section 301 provides jurisdiction in district court over suits for violation of collective bargaining agreements between unions and employers,[4] covering breaches of

---

**3.** Suffice it to note that the Regional Director's determination does not collaterally estop relitigation of the DFR claim in this suit under § 301. *See Vaca v. Sipes,* 1967, 386 U.S. 171, 176-183, 87 S.Ct. 903, 913, 17 L.Ed.2d 842. The Director's unreviewable discretion to issue an unfair labor practice complaint precludes estoppel.

**4.** § 301(a), 29 U.S.C. § 185(a) (1976) provides:
Suits for violation of contracts between an employer and a labor organization represent-ing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

contractual arbitration provisions. *Hines, supra,* at 562, 96 S.Ct. at 1055. And though § 301 does not mention individual employees, it includes their suits to vindicate "uniquely personal" rights such as "wages, hours, overtime pay, and wrongful discharge." *Hines, supra* at 562, 96 S.Ct. at 1055; *Smith v. Evening News Ass'n,* 1962, 371 U.S. 195, 198–200, 83 S.Ct. 267, 269–270, 9 L.Ed.2d 246. Thus, this suit by the plaintiff salesmen for wrongful withholding of fines from their paychecks is encompassed by § 301.

However, in order to effect the congressional policy to favor contractual dispute resolving mechanisms, the Supreme Court has circumscribed an individual employee's right to sue his employer directly under § 301. In *Republic Steel Corp. v. Maddox,* 1965, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580, the Court held that an employee could not avoid the contractual grievance machinery, and that his independent § 301 suit against the employer would be dismissed unless he attempted to exhaust his contractual remedy. Seizing the distinction made by *Maddox* of the situation where "the union refuses to press or only perfunctorily presses the individual's claim . . . ," *Maddox, supra* at 652, 85 S.Ct. at 616, the Court subsequently began to outline the circumstances in which an employee's claim against an employer would not be dismissed in spite of the existence of an available contractual remedy. Essentially, the Court held that an employee's § 301 suit against an employer would not be dismissed when the union, with the sole power to administer the contractual grievance machinery on behalf of the employees included in the bargaining unit it represents, has so abused its exclusive authority as to deprive the employee of his *contractual* remedy. *Hines, supra,* at 571, 96 S.Ct. at 1059; *Vaca v. Sipes,* 1967, 386 U.S. 171, 185, 87 S.Ct. 903, 914, 17 L.Ed.2d 842. The significance of the Court's formulation becomes apparent in this case when it is recognized that an *appeal* from final and binding arbitration is not a part of the remedy provided by the *contract.*

A. The Condition that Union Misconduct Undermine the Employee's Contractual Remedy

The justification for the Court's permitting an individual employee to sue his employer directly under § 301, even where the collective bargaining contract provides a grievance settlement mechanism, is the assumption underlying 29 U.S.C. § 173(d), that "Congress has put its blessing on private dispute settlement arrangements provided in collective agreements [because it] anticipated, we are sure, that the contractual machinery would operate within some minimum levels of integrity." *Hines, supra,* at 571, 96 S.Ct. at 1059. That assumption fails when the union does not satisfy its "well established" statutory "duty of fair representation" in connection with its handling of an employee's claim under the grievance process provided in a collective bargaining agreement.

A union's duty of fair representation was first recognized in the context of the Railway Labor Act, 45 U.S.C. § 151 (1976), in *Steele v. Louisville & Nashville Railroad Co.,* 1944, 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173. Based on the Act's grant of exclusive representation of the employees to the union, the Court found it implicit that the Congress "did not intend to confer plenary power upon the union to sacrifice, for the benefit of its members, rights of the minority of the craft, without imposing on it any duty to protect the minority." *Id.* at 199, 65 S.Ct. at 230. Thus, *Steele* required the union to represent its individual members "without hostile discrimination, fairly, impartially and in good faith." *Id.* at 204, 65 S.Ct. at 232.

■ The *Steele* principle was later extended, first implicitly in *Ford Motor Co. v. Huffman,* 1953, 345 U.S. 330, 337–38, 73 S.Ct. 681, 685–686, 97 L.Ed. 1048, and later expressly in *Syres v. Oil Workers Local 23,* 1955, 350 U.S. 892, 76 S.Ct. 152, 100 L.Ed. 785, to bargaining representatives under

the NLRA. Of course, the duty of fair representation under the NLRA arises from the grant of exclusive status to the representative under § 9(a).[5] After *Smith v. Evening News Ass'n, supra,* permitted an individual employee to sue his employer under § 301 of the LMRA, the Court restated the *Steele* fair representation standard in the context of § 301 as the union's obligation " 'to make an honest effort to serve the interests of all those members without hostility to any . . . subject always to complete good faith and honesty of purpose in the exercise of its discretion.' " *Humphrey v. Moore,* 1964, 375 U.S. 335, 342, 84 S.Ct. 363, 367, 11 L.Ed.2d 370 (quoting *Ford Motor Co. v. Huffman, supra* at 337–38, 73 S.Ct. at 685).

The principles of *Maddox,* that require an individual employee to attempt to exhaust his contractual remedy before he could bring suit under § 301, and of *Humphrey,* that an employee might sue his union under § 301 for breach of its statutory duty of fair representation, were clarified by the Court in *Vaca v. Sipes, supra.* In *Vaca,* the Court found that an employee may seek judicial enforcement of his contractual rights under § 301 when "the union has sole power under the contract to invoke the higher stages of the grievance procedure, *and* if, as is alleged here, the employee–plaintiff has been prevented from exhausting his contractual remedies by the union's *wrongful* refusal to process the grievance." *Id.* at 185, 87 S.Ct. at 914 (emphasis in original). The union's refusal to process a grievance is *wrongful* when the

failure to proceed does not meet the union's obligation to "serve the interests of all members without hostility or discrimination toward any, to exercise its discretion in complete good faith and honesty, and to avoid arbitrary conduct." *Id.* at 177, 87 S.Ct. at 909. In other words, the employee may bring a § 301 suit against his employer when the union has "breached its duty of fair representation in its handling of the employee's grievance." *Id.* at 186, 87 S.Ct. at 919.[6]

Not only may an employee be deprived of his contractual remedy because of a union's *failure* to utilize the contract's procedures in breach of its DFR, he also may be deprived of that remedy because of the union's malfeasance in processing the employee's claim. The employee may bring an independent suit under § 301 when the union's malfeasance is in breach of its DFR. This latter point was settled in *Hines v. Anchor Motor Freight,* 1976, 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231. *Hines* involved an employee's claim that had been resolved in a final and binding arbitration. Again in this case, the Court reasoned that "[a]s in the case where there has been a failure to exhaust . . . we cannot believe that Congress intended to foreclose the employee from his § 301 remedy otherwise available against the employer *if the contractual processes have been seriously flawed by the union's breach of its duty* to represent employees honestly and in good faith and without invidious discrimination or arbitrary conduct." *Hines, supra,* at 570,

5. Section 9(a) of the NLRA provides in part:
   (a) Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: *Provided,* that any individual employee or group of employees shall have the right at any time to present grievances to their employer and to have such grievances adjusted, without the intervention of the bargaining representative, as long as the adjustment is not inconsistent with the terms of a

collective–bargaining contract or agreement then in effect . . . .
29 U.S.C. § 159(a) (1976).

6. *Vaca* expressly stated that "a union does not breach its duty of fair representation . . . merely because it settled the grievance short of arbitration." *Id.* at 192, 87 S.Ct. at 917. *Vaca* indicated that the suit against the union and the employer could be joined in one action. *Id.* at 187, 87 S.Ct. at 915. It further resolved the question of NLRB preemption of court jurisdiction in DFR cases under § 301. Even though proof of a breach of the union's DFR might also establish an unfair labor practice in violation of the NLRA, the court can consider both claims. *Id.* at 180–81, 87 S.Ct. at 911–912.

96 S.Ct. at 1059 (emphasis added). Thus, *Hines* recognized that not only does "[t]he union's breach of duty relieve the employee of an express or implied requirement that disputes be settled through contractual grievance procedures; if it seriously undermines the integrity of the arbitral process the union's breach also removes the bar of the finality provision of the contract." *Id.* at 567, 96 S.Ct. at 1057. That is to say, "enforcement of the finality provision where the arbitrator has erred is conditioned upon the union's having satisfied its statutory duty fairly to represent the employee in connection with the *arbitration proceedings.*" *Id.* at 571, 96 S.Ct. at 1059 (emphasis added). *See Smith v. Hussman Refrigerator Co.,* 8 Cir., 1980, 619 F.2d 1229, 1241 n. 13. The essence of *Vaca* and *Hines* is that the union's misconduct, its breach of DFR, must effectively deprive the employee of his *contractual* remedy in order to remove the bar of either the exhaustion requirement or the finality clause to an employee's independent suit under § 301.

### B. The Contractual Remedy Does Not Include Appeal From Final and Binding Arbitration

■ Appeal, even from formal state or federal court adjudication, is a right wholly conferred by statute. *Cohen v. Beneficial Loan Corp.,* 1949, 337 U.S. 541, 545–46, 69 S.Ct. 1221, 1225, 93 L.Ed. 1528. It is well established that "a State is not required by the Federal Constitution to provide appellate review at all." *Griffin v. Illinois,* 1955, 351 U.S. 12, 18, 76 S.Ct. 585, 590, 100 L.Ed. 891. Likewise, arbitration is informal adjudication, quasi–judicial in nature, *Corbin v. Washington Fire and Marine Ins. Co.,* D.S.C., 1968, 278 F.Supp. 393, 396–97, and the right of appeal is conferred by statute. The salesmen rely on § 301 and on the federal Arbitration Act, 9 U.S.C. §§ 1–14 (1976) as statutory authority which they claim requires this court to review an arbitration award that is final and binding un-

der the contract. We find to the contrary in the circumstances of this case.

■ The Arbitration Act provides federal substantive law to be applied in suits to enforce, vacate or modify arbitration awards covered by the Act. *Sinva, Inc. v. Merrill Lynch, Pierce, Fenner & Smith,* D.N.Y., 1966, 253 F.Supp. 359. The Act does not confer jurisdiction on federal courts, however. *Commercial Metals Co. v. Balfour, Guthrie & Co.,* 5 Cir., 1978, 577 F.2d 264, 268–69. In other words, federal courts apply the Act only when they have independent diversity or federal question jurisdiction. *Litton RCS Inc. v. Pennsylvania Turnpike Comm'n,* D.Pa., 1974, 376 F.Supp. 579, 585, *aff'd* 3 Cir., 511 F.2d 1394. Jurisdiction is supplied here under § 301, since the salesmen claim that this section permits an individual employee to seek review of an arbitration award under the standards set forth in the Arbitration Act, but without regard to that Act's provisions for the limitation of actions regarding time and parties.

■ In compliance with the congressional policy favoring arbitration, the Act lists four narrow grounds[7] upon which a party to the arbitration may apply for vacation of an award:

(a) Where the award was procured by corruption, fraud, or undue means.

(b) Where there was evident partiality or corruption in the arbitrators, or either of them.

(c) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing . . . .

(d) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made . . . .

9 U.S.C. § 10 (1976).[8] Not only does the Arbitration Act limit the right to appeal to

---

7. It should be noted that Massachusetts law will also permit judicial review of an arbitration upon petition by a party to the arbitration. Mass. G.L. c. 150C, § 11. Thus, an action could be brought in state court to vacate an award upon the narrow grounds outlined in § 11.

8. It should be noted that the Massachusetts Act would not permit vacation of the award in this case, even upon timely petition by the Union, a party to the arbitration. Mass. G.L. c. 150C, § 11(a)(5) provides " . . . the fact that the award . . . grants relief such that it could not

a party to the arbitration and narrowly circumscribe the grounds for vacation of an award; it limits the time within which an appeal may be brought to 90 days. 9 U.S.C. § 12 (1976). Though ordinarily in a § 301 suit a federal court will look to the state statute of limitations for the most analogous cause of action where there is no applicable federal limitation, *International Union v. Hoosier Cardinal Corp.*, 1966, 383 U.S. 696, 704–05, 86 S.Ct. 1107, 1112–1113, 16 L.Ed.2d 192, the Act's 90 day limitation on appeals applies in a § 301 action in spite of conflicting state statutes of limitation for review of arbitration awards, *Communications Workers of America v. Pacific Tel. & Tel. Co.*, D.C.Cal., 1978, 462 F.Supp. 736, 739. Here, the Massachusetts limitation is *shorter* than the federal. *DeLorto v. United Parcel Service Inc.*, D.Mass., 1975, 401 F.Supp. 408, 409.

▅ It has been noted, however, that union misconduct tainting the arbitrator's award will remove the finality bar and permit an employee to seek limited review of the award under § 301 in spite of the limitations of the Arbitration Act. That is because the union's misconduct undermines the assumption behind the Act and § 173(d), that "the means chosen by the employer and the union" for resolving breach of contract claims has been given "full play." *Steelworkers v. American Mfg. Co., supra.* The point is that under *Hines*, where there is no unfairness in the operation of the contractual grievance and arbitration proce-

dures, the finality provision of the contract will be enforced to preclude judicial review except upon petition by the Union or employer under the narrow conditions specified in the Arbitration Act. *Hines* removed the finality bar to the employee's § 301 suit because the union's misconduct so seriously undermined the integrity of the arbitration hearing that the employee was deprived of the arbitration bargained for in the contract. In the present case, the Union's failure to appeal the award, whether or not in bad faith, does not deprive the salesmen of the benefit of full and fair play of their contractual remedy. The parties are entitled to no lesser, but no greater remedy than they bargained for. *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 1960, 363 U.S. 593, 599, 80 S.Ct. 1358, 1362, 4 L.Ed.2d 1424. Extending *Hines* and § 301 any further would contravene Congress' express limitations of the Arbitration Act.

▅ To hold to the contrary, i. e., that the finality bar can be removed by alleging post–arbitration misconduct by a union, would seriously undermine employer and union reliance on the arbitration process. In fact, such a rule would make the award open to attack *because* of the union's reliance on the finality of fairly conducted arbitration hearings. One disgruntled union member could, at some *indeterminate* time after an award,[9] collaterally attack it solely on the ground that it should have been appealed by the union. The proper

---

grant or would not be granted by a court of law or equity shall not be ground for vacating or refusing to confirm the award."

Further, even if we were to apply 9 U.S.C. § 10(d) in our review of the arbitrator's modification of the salesmen's discipline, we would find that the fines he assessed "drew their essence from the contract," particularly under Articles VI, VII, and XIV(A). *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 1960, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424. The agreement provides for arbitration of disputes, including those over Article XIV(A), permitting employer discipline "up to and including discharge." Since discharge has been characterized as "the industrial equivalent of capital punishment," *Griffin v. U.A.W.*, 4 Cir., 1972, 469 F.2d 181, 183, it is somewhat

surprising that the salesmen now contend that the "commutation" of their sentence by the arbitrator exceeded his authority.

9. Perhaps as long as 6 years or more after the award, depending upon the forum state's contract statute of limitations that would be applied under § 301, *Hoosier Cardinal, supra.* This would conflict with Congress' intent to impose a *uniform*, and relatively brief period of limitation for review of awards on the grounds specified in the Arbitration Act, and would, effectively, amend that statute. *See Communications Workers of America, supra*, at 738-39.

rule in this case is to hold that "breaching no duty in connection with the arbitration hearings, the parties are entitled to the benefit of finality of that decision." *Curtis v. United Transportation Union*, E.D.Ark., 1979, 486 F.Supp. 966, 971. Counts I and II [10] of the salesmen's complaint against the Company are therefore dismissed with prejudice.

### C. The Union's Failure to Appeal the Arbitration Award is Not a Breach of its DFR

■ We have held that the Union's bad faith failure to appeal an arbitration award does not remove the finality bar to judicial review of an individual employee's claim under § 301 because an appeal is not part of the contractual remedy to which the employee is entitled. The question remains, however, whether as a matter of law a union's bad faith failure to appeal a fairly conducted arbitration is a breach of its duty of fair representation. We hold that it is not.[11]

■ First, since the arbitration proceedings were fairly conducted, both the employer *and* the union are entitled to rely on the finality provision of the contract. "Unless the plaintiffs can prove that the Union's representation was inadequate, the decision rendered as a result of the contractual grievance procedure is final and generally may not be appealed." *Anderson v. Grocers Supply Co., Inc.*, S.D.Tex., 1979, 483 F.Supp. 73, 77; *see King v. Space Carriers, Inc.*, 8 Cir., 1979, 608 F.2d 283, 289.

Second, the salesmen cannot have suffered any injury as a result of the Union's failure to appeal.

[I]t should be noted that a completely fair arbitration of a dispute would necessarily insulate a union from any alleged breaches of its duty of fair representation because the allegedly aggrieved employee could not have suffered any injury from the union's conduct. If an employee's position is changed as a result of fair arbitration, the union cannot be found to have caused the change. Only if the arbitration is tainted in some manner by the union's conduct can the result of an arbitration be attributable to the Union.

*Smith v. Hussman Refrigerator Co., supra,* at 1241 n.13; *accord, Self v. Local No. 61,* 4 Cir., 1980, 620 F.2d 439, 443. Consequently, both Counts I and II [12] against the Union are also dismissed with prejudice.

---

**10.** To the extent that Count II, for wrongful withholding of vacation pay, includes a claim that the amount withheld exceeds the amount specified by the award, it is a grievance properly remedied through the terms of the contract then in effect. Since there is no allegation that the Union wrongfully refused to process such a grievance, this count must be dismissed as well. *Vaca v. Sipes, supra.*

**11.** In a way, this holding is a corollary to holding that an appeal is not part of the contractual arbitration process, and that the Union's misconduct could not therefore deprive the em-

ployee of his contractual remedy. Put another way, we could first hold that a union's failure to appeal a completely fair arbitration award does not breach its DFR because the union's conduct caused the employee no injury–i. e., the employee was not deprived of full and fair play of his contractual remedy. There being no union breach of DFR, we would then hold the suit against the employer under § 301 must be dismissed under *Vaca* and *Hines.*

**12.** *See* footnote 10, *supra.*